Filed 6/29/21  In re T.V. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re T.V., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>　　Plaintiff and Appellant,<br><br>v.<br><br>F.O. et al.,<br><br>　　Defendants and Respondents;<br>T.V.,<br><br>　　Appellant. | A160796<br><br>(Sonoma County<br> Super. Ct. No. DEP-6024) |

The minor, almost two-year-old T.V., appeals from a juvenile court order granting reunification services to her parents, F.O. (mother) and A.V. (father).  The court found that services could be bypassed under Welfare and Institutions Code[1] section 361.5, subdivision (b)(13), based on the parents' history of drug abuse, but that reunification was nevertheless in T.V.'s best interest under subdivision (c)(2) of that statute.  On appeal, T.V. contends

_____

[1] All further statutory references are to the Welfare and Institutions Code.

1

that insufficient evidence supports the best-interest finding.[2]  We disagree
and affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

Mother and father, who are married, have longstanding substance
abuse problems.  Mother, who is in her late 30's, has abused primarily opioids
but also methamphetamine and prescription drugs.  Father, a disabled
veteran in his mid-50's, has numerous convictions for drug-related offenses
dating back to the late 1980's.  He indicated that his drugs of choice are
heroin and methamphetamine.  In addition, both parents have traumatic
brain injuries, mother's due to a vicious 2014 assault.

A.      *July to December 2019:  The Original Petition Is Dismissed.*

T.V., who was born in July 2019, is the second of mother's children to
be the subject of dependency proceedings.  In 2011, one of T.V.'s half sisters,
B.C., was removed from mother's care because "mother was abusing
methadone and klonopin, which resulted in seizures.  The infant was
admitted to the hospital with signs of substance exposure through breast
milk."  Mother failed to comply with her case plan because she "continued to
seek out prescription drugs," and B.C.'s father received full custody.

In July 2013, mother relapsed while caring for then five-month-old
W.O., T.V.'s other half sister.  Mother "followed a safety plan and left the
infant with the maternal grandmother," and the grandmother obtained legal
guardianship of W.O. in probate court.  Mother stated that she subsequently

---

[2] The Sonoma County Human Services Department (Department) also
appealed from the order.  It did not file its own briefing, but it informed this
court that it does not oppose T.V.'s appeal and adheres to its position below
"that services should not have been given to the parents as ordered."

2

"had chunks of sobriety here and there" but "did not fully achieve sobriety" until learning she was pregnant with T.V.

To treat her opioid addiction, mother began taking methadone through the Redwood Empire Addictions Program (REAP) a few years before the events at issue. Although otherwise sober, Mother took methadone throughout her pregnancy with T.V. Thus, T.V. was born with high levels of the drug in her system. In addition, and unrelated to the methadone exposure, T.V. had a difficult birth during which her skull fractured, requiring emergency neurosurgery. She then spent over two months in the hospital during which she "required round the clock, high levels of intervention," particularly to manage her "extreme symptoms of withdrawal" from methadone.

While T.V. was still in the hospital, staff members expressed concern "that the parents [were] not able to meet the needs of this medically fragile child." The parents seemed unable to retain information about how to care for T.V. Father reportedly "declined to participate in much of the training . . . provided to the parents" and appeared to be in "denial that [T.V.] require[d] care beyond that of a typical infant." Mother visited T.V. regularly, but "while at times [mother] appear[ed] appropriate, at other times she appear[ed] groggy and unable to handle [the] baby." Mother also struggled to respond to T.V.'s needs, "consistently becom[ing] overwhelmed by the child's fussiness and crying and request[ing] the child be medicated rather than attempt[ing] to hold and soothe her." On October 9, mother " 'nearly passed out' " in front of staff, "was speaking 'gibberish[,]' and didn't know the day or the year." The Department suspected from mother's behavior that she might be abusing prescription drugs.

Two days later, on October 11, a protective custody warrant was issued for T.V. Soon after, the Department filed a petition alleging that she came within the jurisdiction of the juvenile court under subdivisions (b)(1) and (j) of section 300. The allegations under subdivision (b)(1) were based on both parents' failure to adequately protect T.V. and on mother's "chronic substance abuse problem" inhibiting her capacity to care for the baby. The allegation under subdivision (j), as to mother only, was based on mother's neglect of B.C.

The juvenile court ordered T.V. detained, and she was discharged from the hospital on October 18 and placed in an emergency foster home. The following week, T.V. was placed with her maternal grandfather and step-grandmother in Sacramento due to a wildfire in Sonoma County. T.V. reportedly did well in both homes.

In the November 2019 jurisdiction report, the Department recommended that the dependency petition be dismissed and a voluntary family maintenance case be initiated. The social worker who prepared the report, Penelope Salzgeber, took a significantly different view of the parents than that previously reported. While acknowledging the parents' "colorful histories" and history of addiction, Salzgeber opined that "the allegations of the original petition rel[ied] upon false or misleading assumptions that unfairly paint[ed] the parents in a truly unfavorable light." Although the allegations involving B.C. were undisputed, Salzgeber believed the remaining allegations lacked sufficient evidence, and a dependency case was not justified.

To begin with, Salzgeber concluded there was insufficient evidence that mother's methadone use was problematic. Mother disputed "having a substance abuse problem because she is prescribed methadone, a 'harm

4

reduction medication,' " and reported she had "been sober for over a year." Salzgeber confirmed that mother was "prescribed methadone to manage chronic pain and . . . to prevent relapse of misusing opioids" and opined that "[m]ethadone maintenance in and of itself is not a substance abuse disorder." Much of mother's concerning behavior could be explained by her own ongoing medical problems as a result of T.V.'s birth, which involved a " 'hysterectomy and botched C-Section' " and required mother's subsequent hospitalization as well. Mother needed "multiple blood transfusions, and the side effects include hypotension, infections, dizziness, and sweatiness, all symptoms that could be mistaken for misuse of prescription medication."

In addition, Salzgeber opined that there was no way to know whether T.V.'s severe withdrawal symptoms were due to the amount of methadone mother used during the pregnancy or other factors, including "the barrage of medications and interventions [the baby] experienced during and after birth." After being discharged from the hospital, T.V. "appear[ed] to thrive in the calmer environments of her substitute caregivers," and "[t]he parents appear[ed] more at ease outside the chaotic and overstimulating NICU, and ha[d] demonstrated their ability to meet [T.V.'s] needs for care." Both parents interacted appropriately with T.V. during an observed visit "and appeared to delight in their daughter."

Father reported feeling distressed by "nearly losing his wife and daughter during delivery and never receiving an acknowledgment or apology from the hospital, and then the hospital staff's apparent judg[]ment of the family led to the additional trauma of the Department's intervention and separation of [T.V.] from him and [mother]." Although father had been "criticized for not being present at the hospital frequently enough, he needed to work to maintain housing for his injured, traumatized wife and child."

5

Salzgeber concluded the report by stating that she could "appreciate how some of the misunderstandings [that led to the dependency case] came to be," but the parents' "reality [was] drastically different than the story told on paper." Thus, while cautioning that her recommendation should not be "mistake[n] . . . for a complete absence of concern," she opined that both parents were ready to care for T.V. and entitled to heal after "this period of unbelievable suffering and strain." At the December 2019 jurisdiction hearing, the juvenile court followed the report's recommendations and dismissed the petition in favor of a voluntary family maintenance case. Thus, T.V. was returned to her parents' care.

B. *January to August 2020: The Parents Relapse, Resulting in a New Dependency Case.*

Mother tested negative for all drugs other than methadone throughout January and early February 2020. In mid-February, mother broke her wrist, which required surgery on February 26, and she was prescribed oxycodone. Mother reported that she asked father "to hold [her] pain meds and [her] methadone box," but he began taking her oxycodone. According to a subsequent Department report, in late February mother discovered that father, who had injured his knee, was also using her methadone.

Meanwhile, the COVID-19 lockdown in the Bay Area occurred in mid-March, at which point mother felt she "lost [her] entire support network." Before the lockdown, the family was paying G.P., a friend otherwise employed as an in-home support worker for people with disabilities, to help mother because her wrist injury made it more challenging to care for T.V. Once the lockdown happened, mother asked G.P. to move in to continue helping.

Mother reportedly ran out of her methadone because father took it, and she became sick from withdrawal. About a week after the lockdown began,

6

father obtained methamphetamine, telling mother it would "take the edge off," and they both used it. In later testimony, mother admitted that she took methamphetamine at this time, even though she knew it caused her to have seizures, but she denied that father used her methadone. Father, however, admitted that he used mother's oxycodone and methadone, as well as the methamphetamine. He testified that he had been sober for about three years before this relapse.

In addition, mother reportedly tested positive for fentanyl on February 28, March 3, 6, and 10, and April 21 and 28. At a doctor's visit on March 6, mother stated that she received fentanyl in connection with her wrist surgery. On March 24, mother's doctor called mother to review an "unexpected" positive test for fentanyl, the date of which is unclear from the record. Mother denied using fentanyl, and the doctor indicated she believed mother and "want[ed] to repeat these tests to get more information and appropriately guide her care." Mother later reaffirmed in her testimony that she never used fentanyl and speculated that the methamphetamine she took may have contained it.

On April 19, father overdosed "on benzodiazepines, amphetamine[,] and methadone." Mother reported that leading up to this time father's "behavior ha[d] gotten way out of control," and she asked her father and stepmother to take T.V. but they refused. Mother decided "to get high together one last time" with father before leaving, and he obtained methamphetamine for them. A friend of father's, who was also mother's ex-boyfriend, arrived to help mother convince father to go to the hospital. Father refused, however, and later that morning he fell asleep.

Meanwhile, T.V. had a fever that day. Mother testified that T.V. was with G.P. outside of the home for most of the day and was not present when

mother used methamphetamine. At some point, G.P. left for work and left T.V. with mother. Mother, who described herself as "loaded," called her brother to meet her, and they left the home with the baby around 7:00 p.m. to get Tylenol for her fever. When mother, her brother, and T.V. returned home, father was still sleeping.

Several hours later, mother discovered father lying down "in his own vomit [and] blood." He had "soiled himself" and "looked like he'd been hit in the face." She called 911 and father was taken to the hospital, where he tested positive for methamphetamine. Father also had what appeared to be blisters or burns and "healing slashes" on his right arm, and he could not explain what happened to him.[3] Father soon left the hospital "against medical advice." He was readmitted on April 26 after having a grand mal seizure and again tested positive for methamphetamine.

Meanwhile, on April 21, mother told a social worker that she was "worried that she [was] using too many substances (though she claimed only to be using prescribed medications at that time), and [she] stated that [she knew] she should go into drug treatment." Mother later explained she did not want to tell the social worker she was using but felt the home was unsafe for T.V. The social worker praised mother for doing "a good job of reaching to her supports to get help during this crisis," and at this point the Department was not worried that T.V. was in danger.

On April 28, however, the Department learned that mother had tested positive for methamphetamine six days beforehand. In addition, father's

---

[3] According to mother, father had been "picking at his arm for seven hours a day with a box cutter and paper clip," and these injuries became infected when he was lying "in his own piss and vomit and shit on that arm." Father speculated that mother's ex-boyfriend may have assaulted him, but the issue of how father injured his head was never clearly resolved.

8

Veterans Affairs (VA) social worker reported that the family's home was in disorder, which was unusual, and she was "concerned for the baby's safety at this point." The VA social worker also reported that the hospital told her that after his overdose "father was [lying] on the ground for 'at least 10 hours' before anyone called 9-1-1 for help," and she felt "the baby 'had to be there' at the home for 'whatever took place' or 'for at least part of it,'" contrary to what mother had said.

The following day, on April 29, T.V. was removed from the parents' home. Around the same time, the voluntary family maintenance case was closed because the parents were "not attending services or working with the social worker" and, despite relapsing, had not sought help from the Department.

Once T.V. was removed, "mother admitted that she ha[d] relapsed with illicit substances." Mother "stated she was glad her daughter would be safe in a foster home" while she pursued drug treatment. Despite mother's relapse, a probation search during the removal did not uncover any drugs or drug paraphernalia, and "[t]he home had been cleaned from the week prior and did not appear as cluttered as it had." Father, who was present during the removal, refused to admit to the Department that he was using drugs, but he also stated that he was "glad [T.V.] was being put in foster care because she would be safe."

Shortly after T.V.'s removal, the Department filed another petition alleging that the juvenile court had jurisdiction over T.V. under section 300, subdivisions (b)(1) and (j). The subdivision (b)(1) allegations were based on both parents' substance abuse, focusing primarily on father's overdose and mother's relapse. The same subdivision (j) allegation was again made based

on mother's neglect of B.C. The court ordered T.V. detained, and she remained in a foster home.

According to the Department, mother failed to enter a residential drug treatment program on May 11 as scheduled. Father's VA social worker reported that mother was " 'loaded' " on May 11, and both parents were " 'in full[-]on relapse.' " Mother, however, later testified that she was on the wait list for the program and did not miss an intake. She reported that the program informed her she could not enter treatment because she was taking a benzodiazepine she was prescribed for seizures after methamphetamine withdrawal. A program counselor told the Department this was not the case and mother could enter. As discussed further below, mother ultimately entered a different residential treatment program, Women's Recovery Services (WRS), on May 21.

The Department's May 2020 jurisdiction/disposition report, written by Salzgeber, recommended that both parents' reunification services be bypassed under section 361.5, subdivision (b)(13), based on their drug use.[4] T.V. had some developmental delays, including not being able to sit independently or crawl, gagging on food, and not "babbling." Overall, however, T.V. appeared to be a "cheerful, smiling, engaging baby," and she was doing well in her foster home. The parents had seven scheduled virtual visits with the baby in May, attending five and missing two. They expressed their desire to get drug treatment and be better parents to T.V.

The Department filed an addendum report by Salzgeber in mid-July. T.V. had grown almost two inches in a month, and the doctor who saw her

---

[4] The report also recommended that mother's services be bypassed under section 361.5, subdivision (b)(10), based on termination of her services as to B.C. The juvenile court did not rule on this basis for bypassing services.

10

opined that "the jump in height, in which [T.V.] moved from the .44th percentile . . . to the 10th percentile, was due to eliminating 'chronic stress' from her environment by entering foster care."[5]  Her motor skills had also "improved significantly," and she was thriving in the foster home.

Mother entered WRS on May 21.  She was required to leave the program when she developed a contagious skin condition, and she returned to the program on June 9 after the condition resolved.  Mother later testified that she was able to stay sober throughout this time outside WRS, and she tested negative for all substances except methadone.  Mother had difficulty with other people in the program due to her communication style, and WRS, believing it would be "better for [her] mental health," referred her to an outpatient program, DAAC Perinatal.  Mother was discharged from WRS's aftercare when she failed to attend her scheduled intake at DAAC Perinatal on June 24, but she later explained that she missed the intake due to a misunderstanding about whether it was required.

On June 26, mother completed intake at DAAC Perinatal and tested negative for drugs except methadone.  Mother's doctor was concerned that mother was abusing gabapentin, a medication prescribed for seizures, and trying to " 'self-adjust meds' " by "picking and choosing what she disclosed" to her medical and mental-health providers respectively.  The doctor prescribed another medication to help mother wean herself from the gabapentin. Mother later denied that she had any problem with gabapentin.  Mother was "drowsy, argumentative, and distracted" during a video visit with T.V. on July 9, and she failed to respond when asked to drug test on that date.

---

[5] There was never any evidence presented that T.V. was malnourished or not fed appropriately by the parents.

11

Meanwhile, father entered a residential treatment program called Duffy's on June 25, and he "sounded clearer and healthier." On July 8, he reported to the Department that he was "in treatment and enjoying the programming," although he missed the July 9 visit with T.V. The Department characterized visitation as "poor" overall, given both the difficulty of video visits with a baby and the parents' possible intoxication during them.

The parents submitted on jurisdiction, and in July 2020 the juvenile court found the petition's allegations true. The following month, a contested dispositional hearing was held at which the parents were the only two witnesses to testify. Mother testified that she was currently attending DAAC Perinatal, was in good standing there, and intended to complete the program. In addition, she regularly attended informal backyard meetings that had replaced more formal groups like Narcotics Anonymous during the pandemic. Finally, she was still receiving methadone through REAP.

When mother was asked why she should receive reunification services, she testified that she was in a different place than she had been when she lost her other two daughters and thought she could truly "benefit from the therapy and the outpatient [treatment] and whatever else there is beyond." She testified about her shame in failing her children, stating, "There is no pain like a mother's pain of missing her child, except for when you get used to it, and I will not allow myself to get used to missing my daughter. I will not push this shame down. I will feel it every day. And that is what will motivate me forward." Although acknowledging that T.V.'s foster mother was giving T.V. "a wonderful experience," mother testified that it would be "best for [T.V.] to be with her mother" because of the bond they shared.

Father testified at the hearing that he used mother's prescription drugs and methadone, although he disagreed that this constituted a "relapse" because he was using them for pain relief. He admitted to relapsing on methamphetamine around February 2020. Father testified that he completed the Duffy's treatment program and had been sober ever since entering the program in late June.

The juvenile court concluded that section 361.5, subdivision (b)(13), applied to mother and father but nevertheless ordered reunification services because it found clear and convincing evidence that reunification was in T.V.'s best interest. The court reasoned that although both parents had a "significant relapse" by April 2020, they sought assistance and treatment, and both were in programs at the time of the dispositional hearing. A six-month review hearing was set for January 2021.

C. *Proceedings in This Court*

T.V. and the Department appealed from the dispositional order. In December 2020, T.V. also filed a petition for a writ of mandate in this court, arguing that the appeal was an inadequate remedy because "the juvenile [court] could very well grant additional services to the parents" at the upcoming six-month review hearing, which would "only serve[] to delay [her] permanency and stability." (Boldface omitted.) The following month, this court denied the petition.

In late March 2021, father, joined by mother, filed a motion to dismiss the appeal as moot. This court granted father's accompanying unopposed request for judicial notice of the juvenile court's orders and findings from the six-month review hearing, which actually occurred on March 17, as well as the Department's six-month status review report. Father argued that T.V. could no longer obtain effective relief through the appeal because the juvenile

13

court had extended reunification services based on the parents' "significant progress." This court denied the motion, indicating that reversal of the dispositional order could still provide T.V. with effective relief by terminating reunification services. (See *In re A.E.* (2019) 38 Cal.App.5th 1124, 1140, fn. 6 (*A.E.*).) In now holding that substantial evidence supports the finding that reunification was in T.V.'s best interest, we do not rely on the judicially noticed documents reflecting events after that ruling.

II.
DISCUSSION

A.    *General Legal Standards*

"Generally, the juvenile court is required to provide reunification services to a child and the child's parents when a child is removed from parental custody under the dependency laws." (*In re I.A.* (2019) 40 Cal.App.5th 19, 23.) Services may be bypassed under certain circumstances when " 'reunification efforts are likely to be "fruitless." ' " (*Ibid.*) One such circumstance is "when the [juvenile] court finds, by clear and convincing evidence," that "the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in [a dependency] case plan . . . on at least two prior occasions, even though the programs identified were available and accessible." (§ 361.5, subd. (b)(13).) The parents do not contest the juvenile court's finding that this bypass provision applies to them.

If section 361.5, subdivision (b)(13), applies, services cannot be ordered "unless the [juvenile] court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).) Thus,

14

if a court finds that this bypass provision applies, " ' "the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources," ' " and "[t]he burden is on the parent to change that assumption and show that reunification would serve the best interests of the child." (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227 (*William B.*).)

"The concept of a child's best interest 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' " (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 66 (*Ethan N.*).) In addressing whether reunification is in the child's best interest, "[t]he juvenile court should consider 'a parent's current efforts and fitness as well as the parent's history'; '[t]he gravity of the problem that led to the dependency'; the strength of the bonds between the child and the parent and between the child and the caretaker; and 'the child's need for stability and continuity.' " (*William B.*, *supra*, 163 Cal.App.4th at p. 1228, quoting *Ethan N.*, at pp. 66–67.) In addition, "at least part of the best interest analysis must be a finding that further reunification services have a likelihood of success. In other words, there must be some 'reasonable basis to conclude' that reunification is possible before services are offered to a parent who need not be provided them." (*William B.*, at pp. 1228–1229.)

" ' "A juvenile court has broad discretion when determining whether . . . reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.] An appellate court will reverse that determination only if the juvenile court abuses its discretion." ' [Citations.] If the juvenile court's finding that further services would be in the [child's] best interest is not supported by substantial evidence, then the order for such

15

services constitutes an abuse of discretion." (*A.E., supra*, 38 Cal.App.5th at pp. 1140–1141.)

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before [us] is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012; *In re S.B.* (2013) 222 Cal.App.4th 612, 623.) We make all presumptions " 'in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference[,] and resolving all conflicts in support of the order.' " (*In re G.L.* (2014) 222 Cal.App.4th 1153, 1164.)

### B. *Reversal Is Not Required Merely Because the Juvenile Court Did Not Expressly Address Every Relevant Factor.*

Initially, we address T.V.'s contention that the order granting reunification services must be reversed because "the juvenile court did not properly focus on the mandated best interests factors as outlined in . . . *William B.*" T.V. argues that a court is "*required* to consider" each of those factors and the court here failed to do so. (Italics added.) Specifically, T.V. contends that the court erred by (1) not fully considering the parents' history, particularly mother's history with T.V.'s half sisters; (2) failing to "fully address" the seriousness of the problems leading to dependency; (3) not addressing the bond between T.V. and the parents "at all"; (4) insufficiently "consider[ing] [T.V.'s] need for stability and continuity"; and (5) making "absolutely no finding" of a likelihood that services would be successful. (Boldface omitted.)

Mother argues that this case should not be analyzed in light of the factors enumerated in *William B.*, which were originally set forth in *Ethan N.* She points out that *Ethan N.* involved the bypass provision for a parent who

16

"has caused the death of another child through abuse or neglect" (§ 361.5, subd. (b)(4)), and the decision emphasized "the enormous hurdle faced by [such] a parent seeking reunification" compared to parents whose conduct falls under other bypass provisions. (*Ethan N.*, *supra*, 122 Cal.App.4th at p. 68.) To be sure, the applicable bypass provision will affect analysis of the best-interest issue, and mother and father were clearly in a better position to establish that reunification was in the child's best interest than were the *Ethan N.* parents. But none of the factors that decision discussed are specific to the child-death bypass provision. Indeed, as mother recognizes, *William B.* involved the bypass provision at issue here yet analyzed the best-interest issue in light of the same factors as *Ethan N.* did. (*William B.*, *supra*, 163 Cal.App.4th at pp. 1228–1230.) We conclude it is likewise appropriate to do so here.

A separate issue is whether a juvenile court *must* consider all these factors, which *Ethan N.* characterized as "relevant" to the best-interest issue. (*Ethan N.*, *supra*, 122 Cal.App.4th at pp. 66–67.) Although *Ethan N.* held that the juvenile court there "did not apply the correct standards in examining [the child's] best interest and . . . thus abused its discretion," this was primarily because "[t]he lower court's conclusion . . . that reunification would be in [the child's] best interest evidently was based on the court's concomitant finding that [the mother] had 'made significant progress towards alleviating or mitigating the causes of [her] children's placement in out-of-home care.' " (*Id.* at pp. 65, 68.) Certainly, the case law recognizes that a child's need for stability is key, and there must be reason to think that reunification is possible. (*In re S.B.*, *supra*, 222 Cal.App.4th at p. 623; *William B.*, *supra*, 163 Cal.App.4th at pp. 1228–1229; *Ethan N.*, at p. 67.) But we do not read *Ethan N.* or *William B.* to hold that a juvenile court must

17

*expressly* address these factors or make particular findings in addition to its best-interest finding. Rather, our obligation to presume the juvenile court's order was correct means we also presume the court used the correct legal analysis, absent any indication otherwise.[6] (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193; see *In re Zacharia D.* (1993) 6 Cal.4th 435, 456 [affirming juvenile court's "implied finding" that reunification services were not in child's best interest].) Therefore, although we will analyze the best-interest finding in light of the so-called *William B.* factors, we reject T.V.'s arguments that reversal is required to the extent the court did not expressly address each of those factors.

### C. *Substantial Evidence Supports the Finding that Reunification With The Parents Was in T.V.'s Best Interest.*

T.V. claims that the juvenile court abused its discretion by ordering reunification services because insufficient evidence supported the finding that reunification was in her best interest. According to her, although the parents "made some efforts to come to terms with their addiction, their last-minute efforts and love for their child was not enough to prove to the court, by clear and convincing evidence, that it would be in [her] best interests" to provide them with reunification services.

In analyzing this claim, we structure our discussion around the *William B.* factors as follows. First, as to mother, we address three factors that revolve around her substance abuse: a parent's history and current efforts and fitness, the gravity of the problem that led to the dependency, and

---

[6] T.V. argues in passing that the juvenile court improperly relied on *In re B.E.* (2020) 46 Cal.App.5th 932. Although *B.E.* involved whether the same drug-history bypass provision applied, not whether reunification was in the minors' best interest (see *B.E.*, at pp. 934–935), we disagree with T.V. to the extent she suggests the juvenile court's reference to that decision establishes an abuse of discretion.

the likelihood that services will succeed.  Second, as to father, we address the same three factors, which also revolve around his substance abuse.  And finally, as to both parents, we address the factors of the child's bond with the parent and caretakers and the child's need for stability and continuity.

      1.     Mother

      *a.     Mother's history*

There is no dispute that mother has a serious drug addiction and that it prevented her from parenting her two other daughters.  T.V. is incorrect, however, when she states that the juvenile court did "not consider[] [m]other's prior CPS history."  As the court observed, mother lost custody of B.C. nearly a decade before this proceeding was initiated, reducing its relevance to mother's current circumstances.  In addition, mother voluntarily agreed to let her mother take W.O., which the court said "sounds like a safety plan.  That sounds like something that [mother was] doing for her daughter and should not be used against [mother] in this proceeding because she made that step."  Thus, the court clearly considered mother's history with her other children but declined to hold it against her when deciding whether reunification was in T.V.'s best interest.  And the court was entitled to do so, given that history's remoteness, the relative lack of information about the circumstances involving either half sister, and mother's subsequent substantial periods of sobriety.

T.V. also highlights that "[m]other herself indicated that she continued to struggle with sobriety since these cases [involving B.C. and W.O.] and over the years."  (Boldface omitted.)  Again, while it is true that mother was not consistently sober after the events involving her other children, her testimony provided substantial evidence that she was able to maintain significant periods of sobriety.  Notably, she attained sobriety upon learning

she was pregnant with T.V., and she consistently managed her opioid addiction with methadone throughout the proceedings below. Thus, while the juvenile court found that mother "has a history of extensive, abusive, and chronic use of drugs" and "resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention" in determining the bypass provision applied (§ 361.5, subd. (b)(13)), mother's overall addiction history also had mitigating aspects supporting the conclusion that reunification with T.V. was still possible and desirable.

T.V. also faults the juvenile court for "factor[ing] in the fact that the . . . previous petition [filed in October 2019] had been dismissed as clear and convincing evidence that it was in [her] best interest to offer the parents . . . services." In fact, what the court stated was that Salzgeber's *description* of the parents in the November 2019 report, which ultimately led to the petition's dismissal, was clear and convincing evidence that reunification was in T.V.'s best interest. Thus, it was not the prior petition's dismissal per se but the information about the parents that Salzgeber provided that supported granting reunification services.

In turn, that report, from which the juvenile court quoted at length, reflected that the parents were extremely motivated to have a family with T.V. and had been misunderstood and unfairly treated by various professionals involved in the case. As to mother specifically, the report constituted substantial evidence that T.V.'s medical difficulties, as well as questionable behavior on mother's part, were attributable to the birth's traumatic effects on both mother and the baby, not any substance abuse by mother. The report supports the conclusion that mother was doing her best to parent T.V. under difficult circumstances.

20

### b.    *Mother's relapse*

It is uncontested that both parents eventually relapsed, which led to the filing of the petition at issue.  In this regard, the juvenile court found it notable that mother asked for help after father relapsed, even though she had not yet admitted that she relapsed as well.  In addition, the court observed that "mother took protective actions by calling 911" after father overdosed and "later reaching out to family and friends" for help.  The court also noted circumstances suggesting the baby's safety was not threatened during this period.  It found that although father's overdose was "concerning," T.V. "was not home during . . . most of that time."  In the period immediately after father's overdose, T.V. was observed to be doing well, and even when she was removed mother remained "calm" and the probation search did not uncover drugs or drug paraphernalia.  This discussion suggests the court's conclusions, as to the first and second *William B.* factors, that mother was able to seek help when needed and that the problems leading to T.V.'s dependency were not especially grave.

T.V. attempts to discount many of these findings, but in doing so she fails to recognize our obligation to view the record in the light most favorable to the juvenile court's ruling.  For example, T.V. notes that while "[m]other initially asked for help from the Department on April 21, 2020, it must be remembered that this was during a time when she was still actively in the throes of her addiction unbeknownst to the Department [or anyone else]."  T.V. also argues that "the court appears to be mistaken that [m]other reached out to family and friends appropriately," because mother raised "only . . . her concerns about [f]ather using" without "report[ing] that she herself was experiencing issues with drug use."  (Boldface omitted.)  And T.V. accuses mother of "minimiz[ing]" or even "outright den[ying]" father's inappropriate

conduct, primarily based on mother's testimony that father did not use her methadone. But even if mother could have been more open with others, the court was still entitled to give her credit for her efforts to seek help and try to protect T.V. Any failure by mother to be perfectly transparent in doing so hardly negated the substantial other evidence of her positive efforts.

T.V. also contends that mother's actions on April 19, the day father overdosed, "placed [T.V.] in grave danger, contrary to [mother's] testimony, which demonstrated a total denial of this fact." Mother testified that T.V. "was with [G.P.] for the duration of the day, and then when he went to work, he called [mother's] brother. . . . [¶] First, [T.V.] was with [G.P.] alone, and then she was with [mother's brother], who was . . . dropping [mother] off at the house and taking the baby while [mother] sobered up." T.V. contends that this testimony "gave the [juvenile] court the impression that [T.V.] was never left alone in [mother's] care" on April 19, even though, according to the May 2020 report, mother said there was a period of time after G.P. went to work when she and father's friend, who had also been using drugs, were alone with the baby.

To the extent there were any discrepancies in the information mother provided, the juvenile court was entitled to credit her testimony at the hearing. Indeed, mother testified that statements attributed to her in Department reports did "not reflect" what she actually said. T.V.'s briefing reads as if the Department's reports contain the objective truth and any statements by mother to the contrary must be rejected. But mother's testimony is also legitimate, substantial evidence of what she described, and we must presume the court resolved conflicts in the evidence in her favor. Viewed in this light, the record shows that mother did not take care of T.V. alone for any significant amount of time on April 19.

22

T.V. next argues that mother's testimony about her own drug use more generally paints "a picture of a woman in total denial about the seriousness of her drug addiction and sustained pattern of drug use when she was [T.V.'s] caretaker." T.V. points to discrepancies in mother's testimony about her use of methamphetamine, but mother ultimately admitted that she used the drug twice, once in late March and once on April 19. This appears to be consistent with her positive tests for methamphetamine on March 24 and April 21.[7] The juvenile court was not required to conclude that mother was "in denial" just because it took time for her to clarify when she used methamphetamine, particularly given the evidence that mother had difficulty remembering things because of her traumatic brain injury.

T.V. also points out that mother denied that she abused fentanyl, despite having six positive tests for the drug. But the juvenile court was entitled to credit mother's explanations that she received fentanyl in connection with her wrist surgery and that it was possible the methamphetamine she took was tainted. T.V. may be correct that mother's testimony does not explain all the positive test results, but it is notable that mother was being drug tested by both by her doctor and REAP, and the results were not always consistent. For example, although mother's doctor was concerned that mother tested positive for fentanyl around March 24, on

---

[7] T.V. claims that mother also tested positive for methamphetamine on April 22, implying mother used the drug *three* times, based on the following statement in the May 2020 report: "Redwood Toxicology Report dated April 22, 2020[,] positive for amphetamine and methamphetamine." It appears this was a typographical error, as the summary of mother's REAP test results attached to the July 2020 addendum report shows that mother did not test at all on April 22. Moreover, even if mother had tested positive for methamphetamine on April 22 as well, we have no basis on which to conclude this necessarily meant that mother used the drug after April 19.

the same date she tested negative for that drug at REAP. And although she tested positive for fentanyl at her doctor's visit on April 28, a REAP test on the same date was negative for the drug. Thus, the court could have reasonably determined that mother never knowingly took fentanyl to get high during the relevant time period.

Similarly, we reject T.V.'s argument that mother's refusal to admit she abused gabapentin was additional evidence that mother was "in total denial about her serious addiction and substance abuse." T.V. claims "this testimony was wholly inconsistent and in contradiction to what [mother's doctor] told the social worker as documented in the . . . [July 2020 report]." But the juvenile court was entitled to credit mother's testimony over her doctor's suspicion, a credibility determination we cannot second guess on appeal. While there was no question that mother relapsed and used methamphetamine twice, the court was not required to conclude that she also abused fentanyl and gabapentin or, more generally, that she was "in denial" about her drug problem.

> c. *Mother's current efforts and the likelihood that services will be successful*

The juvenile court also considered mother's current efforts to address her drug addiction in concluding that reunification was in T.V.'s best interest. As the court observed, mother "submitted evidence that . . . she is [an] active and regular participant in the DAAC [P]erinatal program, and she is now actively participating in REAP." The evidence also showed that mother successfully participated in residential drug treatment through WRS for a month, at which point she followed that program's advice to enter an outpatient program.

T.V. maintains that mother's efforts in this regard "were eclipsed by her delay in seeking treatment, the multitude of problems she displayed

24

during her treatment, as well as the paucity of information about her ongoing treatment." T.V. faults mother for not admitting that she relapsed or "taking steps to look into programs until after [T.V.] was removed on April 30." (Boldface omitted.) T.V. also points to evidence that mother did not follow through with other programs to which she was referred before entering WRS, that mother's behavior required her to leave WRS early, and that she did not complete WRS's aftercare. Again, however, this evidence does not negate the substantial other evidence that at the time of the dispositional hearing mother was obtaining drug treatment and on track to successfully complete it. Even if there may have been delays and road bumps along the way, this did not prevent the juvenile court from relying on evidence of mother's overall sincere and significant efforts to address her substance abuse problem.

Mother's efforts in drug treatment also provide substantial evidence of a likelihood that services would be successful and reunification is possible. Again, by the time of the dispositional hearing, mother had completed a month of residential drug treatment and was participating in an outpatient program she anticipated she would successfully complete. She was also still participating in REAP, a commitment she had maintained since before T.V.'s birth. Since mother's primary problem is opioids, the juvenile court could properly rely on her consistency with REAP as a key indicator that reunification was possible. Indeed, as suggested by our discussion above of mother's positive tests for fentanyl, it is not clear that her relapse even involved opioids. And while we do not minimize the seriousness of mother's use of methamphetamine, the court could have reasonably determined there was a likelihood mother would successfully avoid that drug, which she testified she had rarely taken, and continue to avoid opioids. In short, we reject T.V.'s claim that "[t]here is no evidence in the record that would

25

remotely suggest that there is a likelihood that services would be successful and that reunification is possible." (Boldface omitted.) To the contrary, if mother's testimony was believed, as the court was entitled to do, there was plenty of evidence to establish a likelihood that services would successfully address her drug addiction and she could reunify with T.V.

### 2. Father

It is undisputed that father also has a history of substance abuse. Although there is significantly less evidence in the record about father than about mother, including on this point, T.V. correctly points out that father's criminal history suggested he has a longtime drug problem. But father's most recent drug-related conviction was for possession of a controlled substance in late 2016, and he testified that he completed a drug treatment program and was then sober for about three years before the relapse at issue. Thus, there was evidence that father had successfully addressed his drug problem before and was capable of maintaining long periods of sobriety.

Father's relapse in early 2020 was undoubtedly serious, culminating in his hospitalization on April 19. The juvenile court noted, however, that on that date T.V. "was not home during most of that time," mother sought help, and the Department "at this point [was] not seeing any safety threat." Contrary to T.V.'s claim otherwise, there is no evidence that on April 19 "she was exposed to the same type of chaos and dysfunction that presumably stunted her growth while she resided with her parents prior to removal." Rather, the record suggests father passed out relatively early in the day, permitting the conclusion that T.V. was not directly exposed to his negative behavior even if she was present at some point after he overdosed.

T.V. also argues that because father knew mother was using drugs at the same time, his relapse was "the very epitome of a failure to protect and

. . . placing [one's] child at risk of . . . harm." It is true that if both parents had not relapsed, T.V. would not have become a dependent at the time she did. As discussed above, however, the juvenile court was entitled to conclude that the problem leading to dependency was not especially grave, given mother's protective actions and the lack of evidence that T.V. was ever in real danger on April 19 or immediately afterward.

As for father's current efforts to address his drug problem, T.V. claims they "were minimal and unknown at best." T.V. points to the May 2020 report's statement that "father has refused to enter residential treatment and has not commenced intensive outpatient treatment." Yet in the same report, father was quoted as saying, "I'm gonna do this outpatient thing and counseling, and if it doesn't work in a couple weeks, we agree I'll do the inpatient thing." The record does not reflect whether father did in fact attend outpatient treatment, but the following month he entered an inpatient program at Duffy's. Father indicated that the delay in entering Duffy's was because the VA paid for it, and "it took some time to get that all worked out for [him] to go." He also testified that he successfully completed this program and was still sober. His testimony was substantial evidence that he was actively addressing his drug problem.

This evidence of father's efforts also supported a finding of a likelihood that services would be successful and reunification was possible. Although father arguably was in more denial than mother was and took longer to seek help for his problems, we agree with him that his "participation in a residential drug treatment program and sobriety cannot be ignored." It appears self-evident that successfully completing a drug treatment program and continuing to maintain sobriety is substantial evidence of a likelihood that services, which in both parents' cases would presumably focus on their

27

substance-abuse issues, will be successful.  We reject T.V.'s argument otherwise.

### 3. The strength of T.V.'s bonds with her parents and her caretakers and her need for stability and continuity

Finally, we address the two *William B.* factors that focus on a child's relationships and needs.  Although T.V. does not dispute that her parents love her, she argues that her bonds with them were not strong enough to weigh in favor of determining that reunification was in her best interest.  In particular, she focuses on the "poor" quality of visitation during the three months between her removal and the dispositional hearing.  Viewing the record in the light most favorable to the parents, however, we conclude that the visits were unsatisfying primarily because they had to be held by video due to the COVID-19 pandemic.  As another court recently observed, "We can all appreciate now . . . that video meetings are not an adequate substitute for meeting in person, even for adults.  That's even more true for children, especially small children, who aren't cognitively developed enough to engage in that setting." (*In re S.S.* (2020) 55 Cal.App.5th 355, 377.)  The Department's visitation logs also reflect that the parents, particularly mother, *tried* to engage T.V., and the parents consistently expressed affection toward their daughter.  The juvenile court was entitled give little weight to the fact the parents may have had difficulty holding T.V.'s attention during visits.

Of more concern was a report that both parents appeared to be "under the influence" during a June 25 visit.  But according to the social worker who had been supervising visits, mother "stated [father] had used the night prior and was not high but was coming down."  Mother also "denied using substances herself" on this occasion, a claim she repeated at the dispositional

28

hearing.  Thus, there was substantial evidence that neither parent was actually intoxicated during this visit.

T.V. also points to the evidence that she began to thrive physically once she was removed as suggesting that her bond with her foster family was strong and her bond with her parents was weak.  She points to both her jump in height and her improved developmental markers between May and June 2020.  Even though this evidence led T.V.'s doctor to opine that "there was 'clearly dysfunction and chaos' in [T.V.'s] home environment with [the parents] that impacted [T.V.'s] growth and development," it is speculative to infer much of anything about T.V.'s bonds with the parents or the foster family from this information.  Substantial other evidence in the record, including visitation logs and the parents' own statements about their daughter, supports the conclusion that the parents and T.V. were bonded.  As for the foster family, T.V. recognizes that "[t]here is little information in the record about [her] relationship with" them, and it is reasonable to infer she did not have a strong bond with them since she had been living there for only two months by the time of the dispositional hearing.  In sum, the juvenile court was not required to weigh this factor against the parents.

T.V. also claims that the juvenile court "failed to properly consider [her] need for stability and continuity" in ruling.  She argues that she "is in a stable placement where all of her needs are being met," and it will take too long for the parents to address their drug addiction in light of each one's "lengthy history, very recent efforts in this case, and continued denial and minimization."  As discussed above, however, the evidence hardly compels this myopic view of the parents, and the court was entitled to credit their successful efforts to get treatment in determining that preserving the

29

possibility of reunification did not outweigh T.V.'s need for stability and continuity.

We agree with T.V. that because of her very young age, " ' "moving to permanency more quickly is critical." ' " (Quoting *Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606, 612.) But this interest is protected by the shorter amount of time that mother and father will have to try to reunify with their daughter (see *id.* at p. 610), and they have little room for error. As the juvenile court cautioned them, "A relapse at this point during reunification services would be devastating to your ability to retain those services." Since the record contains substantial evidence to support the finding that reunification is in T.V.'s best interest, we conclude that the court did not err by giving mother and father another chance.

III.
DISPOSITION

The August 7, 2020 order granting reunification services to mother and father is affirmed.

_____

Humes, P.J.


WE CONCUR:


_____

Margulies, J.


_____

Banke, J.


*In re T.V.* A160796